

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRUKER NANO, INC., an Arizona corporation,<br><br>       Plaintiff,<br><br>v.<br><br>BEIJING TRANSCEND VIVOSCOPE BIO-TECHNOLOGY, CO., LTD., a Chinese limited company,<br><br>       Defendant. | Case No.:  25-cv-02890-JO-BJW<br><br>**MINUTE ORDER DENYING EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER** |

On November 4, 2025, Plaintiff microscope manufacturer, who holds the trademark "nVista," filed a motion for an *ex parte* temporary restraining order (TRO) to enjoin Defendant microscope manufacturer from using the term "TRANSVISTA" in connection with the advertising and sale of digital microscopes, particularly at next week's conference in San Diego starting November 15, 2025.  Dkt. 5 ("TRO Mot.").

Under Fed. R. Civ. P. 65(b), to obtain a TRO, a plaintiff must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an

injunction is in the public interest. *Am. Trucking Assn's Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 21 (2008)); *see also Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (standard for a TRO and preliminary injunction are "substantially identical"). A TRO is "an extraordinary and drastic remedy . . . that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (internal citation omitted). As the moving party, here the Plaintiff bears the burden to show that this extraordinary remedy is warranted at this time. *See DISH Network Corp. v. F.C.C.*, 653 F.3d 771, 776 (9th Cir. 2011).

"To prevail on a claim of trademark infringement under the Lanham Act, 15 U.S.C. § 1114, a party 'must prove: (1) that it has a protectible ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion.'" *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1144 (9th Cir. 2011) (quoting *Dep't of Parks & Recreation v. Bazaar Del Mundo Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006)). A likelihood of confusion arises "when consumers are likely to assume that a product or service is associated with a source other than its actual source because of similarities between the two sources' marks or marketing techniques." *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 825 (9th Cir. 1993) (quotation marks and citation omitted). To assess whether such confusion is likely, the Ninth Circuit applies the following factors: (i) the strength of the protected mark; (ii) the proximity of the goods; (iii) the similarity of the marks; (iv) evidence of actual confusion; (v) the similarity in the marketing channels used; (vi) the type of goods and the degree of care likely to be exercised by consumers; (vii) the defendant's intent in selecting its mark; and (viii) the likelihood of expansion into other markets. *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979), *abrogated on other grounds by Mattel Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 810 n.19 (9th Cir. 2003). The *Sleekcraft* framework is not a mechanical checklist but a flexible, fact-specific inquiry. As the Ninth Circuit has emphasized, "[t]his eight-

2

factor analysis is 'pliant,' illustrative rather than exhaustive, and best understood as simply providing helpful guideposts." *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1030 (9th Cir.2010) (quoting *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1054 (9th Cir. 1999)). The factors "function as a proxy or substitute for consumer confusion, not a rote checklist. In other words, 'we do not count beans.'" *Rearden LLC v. Rearden Com., Inc.*, 683 F.3d 1190, 1209 (9th Cir. 2012) (quoting *Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir.1998)). Accordingly, courts focus on those factors most relevant to the facts of the case, recognizing that other context-specific variables may also bear on the overall likelihood of confusion. *See id.*

Here, while it appears Plaintiff holds a protectable interest in its nVista trademark because it has a U.S. Trademark Registration, TRO Mot at 12; Ex. A, Plaintiff has not demonstrated that it is likely to prevail on the claim that the two marks pose a threat of consumer confusion. First, sophisticated buyers of expensive, highly specialized scientific equipment are less likely to be confused by superficial similarities in a product name. As the Ninth Circuit has explained, "[w]hen the buyer has expertise in the field, a higher standard is proper . . . . Similarly, when the goods are expensive, the buyer can be expected to exercise greater care in his purchases." *Network Automation*, 638 F.3d at 1152 (citations omitted). *M2 Software, Inc. v. Madacy Entertainment* is instructive. 421 F.3d 1073 (9th Cir. 2005). In that case, the Ninth Circuit affirmed judgment for the defendant where both parties operated in the same industry but targeted highly knowledgeable buyers. *Id.* The court held that "the possibility of confusion to industry professionals would be almost nil" because such purchasers were "highly sophisticated" and "well informed about the nature of [the product] and its producer before making a purchasing decision." *Id.* at 1084. The same reasoning applies here. Both companies market advanced, wearable fluorescence microscopes to neuroscience research institutions and laboratories. *See* TRO Mot. 2:4–6. Plaintiff's nVISTA systems cost between approximately $49,000 and $275,000 each, and since 2012, Plaintiff has sold roughly 640 systems worldwide, generating over $52 million

in revenue.  Dkt. 5-7 ("Tiret Decl.") ¶¶ 7–8.  These are not casual retail purchases, but substantial institutional investments made after careful deliberation.  The purchasers are Ph.D.-level scientists and research professionals, who are familiar with the product specifications, negotiate directly with vendors (*e.g.*, at the upcoming neuroscience conference), and make deliberate procurement decisions after extensive evaluation.  Given these circumstances, the likelihood of mistaken source identification is exceedingly low.

Second, the two marks, nVista and TRANSVISTA, are not sufficiently similar to warrant a finding of probable confusion.  "Similarity of the marks is tested on three levels: sight, sound, and meaning."  *Sleekcraft*, 599 F.2d at 351.  Although both marks contain the element "VISTA," the prefixes "n" and "TRANS" materially distinguish them visually, phonetically, and conceptually.  TRANSVISTA evokes "transmission" or "transcendence," while nVISTA connotes "neural" or "neuro."  Dkt. 5-10 ("Ghosh Decl.") ¶ 8.  Even in identical typeface, TRANSVISTA occupies nearly twice the visual space and the marks sound quite distinct when spoken.  Considering the overall impression, these differences are significant in the professional marketplace at issue, and do not risk confusion among the relevant consumers.

Third, the term "vista" is entitled to less protection because it is commonly used in the optical and imaging market.  As opposed to arbitrary or fanciful terms coined "solely to function as a trademark," *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1390 (9th Cir.1993), common or descriptive marks are considered weaker cases for protection because they are more likely to be "needed by competitors to describe their products."  *Rodeo Collection, Ltd. v. W. Seventh*, 812 F.2d 1215, 1218 (9th Cir. 1987).  In addition, a "marketplace [that] is replete with products using a particular trademarked word indicates not only the difficulty in avoiding its use but also, and directly, the likelihood that consumers will not be confused by its use."  *Entrepreneur Media, Inc. v. Smit*h, 279 F.3d 1135, 1144 (9th Cir. 2002) (citations omitted).  In "a crowded field of marks," customers will "have learned to carefully pick out one from the other."  *Miss World (UK) Ltd. v. Mrs. America Pageants*, Inc., 856 F.2d 1445, 1449 (9th Cir.1988).  The term "vista," meaning

4

"view" or "sight," is commonly used in optical and imaging contexts; it is not arbitrary or fanciful nomenclature when applied to such equipment.  A brief Google survey of the marketplace reveals multiple "Vista"-branded imaging products, including the Vista One nano-IR microscope and spectrometer (Molecular Vista), the VWR VistaVision upright compound microscope, and the Vista Engineering scanning electron microscope.  This widespread usage narrows the scope of protection and renders the "nVista" mark conceptually weak. *Id.* at 1142.  In such a crowded field, purchasers are more likely to notice the distinctive prefixes ("n" versus "TRANS") than the shared descriptive suffix.  Therefore, the common usage of the term "vista" weighs against a risk of confusion.

Moreover, the record contains no evidence of actual confusion, and both parties sell directly to institutional customers rather than through overlapping retail or distributor networks, further reducing confusion risk.  *See M2 Software*, 421 F.3d at 1081.  There is also no evidence that Defendant acted in bad faith or intended to trade on Plaintiff's goodwill.

For the above reasons, the Court concludes that Plaintiff has not demonstrated a likelihood of success on the merits of its claim.  Accordingly, the Court DENIES Plaintiff's *ex parte* application for a TRO.  [Dkt. 5]

**IT IS SO ORDERED**.


Dated:  November 5, 2025

_____
Honorable Jinsook Ohta
United States District Judge